IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

BRANDON PIPER,

Defendant.

Crim Action No. 09-218

## OPINION

Pending before the Court is Defendant Brandon Piper's "Motion to Suppress Evidence With Accompanying Citation of Authority" ("Defendant's Motion to Suppress") [Doc. #38]. A hearing on Defendant's Motion to Suppress was held by this Court on July 21, 2010, wherein East Pennsboro Township police officer Steven Coverdale testified credibly for the Government. At issue are whether Mr. Piper's statements to Officer Coverdale on August 19, 2007, and any evidence derived therefrom, must be suppressed. For the reasons set forth below, Defendant's Motion to Suppress is denied.

**I. Facts of Record.**

After hearing testimony by Steven Coverdale at the suppression hearing with respect to the events that occurred in the early morning of Sunday, August 19, 2007, the Court makes the following findings of fact:

At approximately 5:50 AM on August 19, 2007, Officer Coverdale, an East Pennsboro Township, Pennsylvania police officer was told that county dispatch had received a call from Jennifer Roberts of the Hershey Medical Center. Officer Coverdale returned the phone call and was told by Ms. Roberts that one Bruce Brandler was at the hospital and wanted to speak to

Lieutenant Green. Officer Coverdale explained that Lieutenant Green was not on duty, but that he would speak to Mr. Brandler.

Mr. Brandler and Officer Coverdale then spoke on the phone. Mr. Brandler explained that his son, EB, had been dropped off at Holy Spirit Hospital ("Holy Spirit") by two young men for an apparent drug overdose, had been transferred to Hershey Medical Center for further treatment, and had subsequently died. Mr. Brandler also told him that he had talked to Lieutenant Green about his son in the past because EB had overdosed on drugs in May 2007 and that his son was a drug addict. Mr. Brandler asked Officer Coverdale to get a copy of Holy Spirit's surveillance records to find out who the two young men were that took EB to the hospital. Mr. Brandler thought that EB might have been with "Michael Paul" and "Luke" and that these young men were students at East Pennsboro High School. Mr. Brandler also told Officer Coverdale that no cause of death had yet been determined and that he didn't know if the county coroner had been contacted yet. EB's use of heroin was never brought up in the conversation.

Officer Coverdale did not know or know of Mr. Brandler or EB prior to August 19, 2007. It was not clear whether or not at some point during this initial conversation with Mr. Brandler, Officer Coverdale realized that Mr. Brandler was an Assistant United States Attorney.

After the telephone call with Mr. Brandler, on his way to Holy Spirit, Officer Coverdale used the computer in his police car to search for any information regarding "Michael Paul" or "Luke." He also looked at an East Pennsboro High School yearbook, but did not find anyone who matched those names.

Officer Coverdale also retrieved information about EB's prior overdose. By looking at the file about the incident, wherein EB was mistakenly referred to as "Erik Bandler" (an error Officer

2

Coverdale did not notice), Officer Coverdale learned that Lieutenant Green had been involved in the earlier case, that EB had overdosed on ecstasy on May 16, 2007, had been found in his front yard, and that a search warrant had been executed for Justin Smith's house as a result of EB's overdose. He did not review either the search warrant or the affidavit in support of the search warrant. He did find it significant that EB had overdosed on ecstasy a few months before his death.

Still on his way to Holy Spirit, Officer Coverdale then spoke to Lieutenant Green. He explained to Lieutenant Green that EB had died from a drug overdose and asked permission to call out a detective to speak to Mr Brandler. Lieutenant Green approved calling out a detective, specifically Detective Shope. Officer Coverdale and Lieutenant Green did not talk about EB's May 2007 overdose.

Officer Coverdale also inquired, via the computer in his vehicle, whether EB had any prior involvement with the police. He did not, other than the May 2007 overdose.

Officer Coverdale proceeded to go to Holy Spirit Hospital. He was alone, in uniform and in a marked police car. At the hospital, he spoke with three individuals: (1) Theresa Guido, a security officer; (2) Jennifer Romanoff, the Emergency Room ("ER") secretary; and (3) Amber Thomas, an ER technician.

He learned from Ms. Romanoff that EB had been brought to the ER by nineteen (19) year old Brandon Piper and another young man at 3:00 AM; the two men came into the ER saying that they needed help for a friend who still was outside in Piper's vehicle. She did not mention to Officer Coverdale that they said he needed narcan or methadone. Ms. Romanoff and Ms. Thomas

went out to Mr. Piper's car and saw EB sitting in a gold Ford Taurus. He was not responsive, his lips were blue, and he was cold to the touch.

Officer Coverdale learned from Ms. Guido that one of the boys told her that he had just gotten off work and didn't want to be involved. The other boy told her he was Brandon Piper, gave her his cell number, and asked that she update him on EB's condition. Mr. Piper also told Ms. Guido that he had picked EB up and had brought him to ER because he was non-responsive. Officer Coverdale obtained Mr. Piper's cell phone number from Ms. Guido.

Officer Coverdale asked Ms. Guido for the hospital's surveillance tape. She explained that it was hospital policy not to provide the tape without a court order. Officer Coverdale does not know of any court order ever being obtained for the tape.

Officer Coverdale was at Holy Spirit for about 10 minutes. He then spoke with Detective Shope. Detective Shope said that he was going to speak with Mr. Brandler, but had not done so yet. Detective Shope asked Officer Coverdale to interview Mr. Piper. Detective Shope did not tell Officer Coverdale what questions to ask Mr. Piper and Officer Coverdale did not ask Detective Shope what questions to ask Mr. Piper.

Officer Coverdale used the computer in his vehicle to obtain Mr. Piper's home address in Camp Hill, Pennsylvania; Mr. Piper's home is located less than one mile from Holy Spirit. Officer Coverdale also learned that Mr. Piper drove a Ford Taurus.

Officer Coverdale arrived at Mr. Piper's house at approximately 6:20 A.M. At the time he arrived he was in full uniform, wearing a handgun and a Taser on his belt. There was a gold Ford Taurus in the driveway. Officer Coverdale did not attempt to enter the Taurus. He took photographs of the car. He also looked inside the car and saw nothing noteworthy.

As Officer Coverdale approached Mr. Piper's split level house, the sun was up. It did not appear that anyone was awake in the house. He knocked on the door and it was answered by Russell Minnich, who identified himself as Mr. Piper's grandfather.

Officer Coverdale asked if Mr. Piper was home and asked if he could speak to Mr. Piper. Mr. Minnich allowed Officer Coverdale to enter the house. Officer Coverdale walked up a set of stairs and waited while Mr. Minnich got Mr. Piper.

After five or ten minutes Mr. Piper appeared in his sleep clothes. Officer Coverdale identified himself and where he worked. He told Mr. Piper he wanted to talk to him about the events that occurred with EB at Holy Spirit Hospital that morning. Officer Coverdale told Mr. Piper that EB had overdosed on drugs; he did not tell Mr. Piper that EB had died.

Officer Coverdale also told Mr. Piper that Mr. Piper did not have to talk to him and that he would leave if Mr. Piper asked him to leave. Officer Coverdale did not give Mr. Piper a Miranda warning at any time during the subsequent interview.

Mr. Piper nodded in agreement to these statements and agreed to speak to Officer Coverdale. He appeared to have just woken up; he was groggy and disoriented for the first few minutes of the conversation, which ended up lasting approximately 45 minutes. Officer Coverdale did not observe any signs of recent use of drugs or alcohol by Mr. Piper. Officer Coverdale neither looked for nor saw any needle marks on Mr. Piper's body.

Mr. Piper, Officer Coverdale, and Mr. Minnich went into the living room. Mr. Piper sat on the couch, Officer Coverdale sat a few feet away from him on a chair or love seat. Officer Coverdale did not recall whether or not Mr. Minnich sat down; after a few minutes, Mr. Minnich left the room. Officer Coverdale told Mr. Piper that someone had gotten his license plate from

5

the parking lot; this was not true. Officer Coverdale did not tell Mr. Piper that he knew Mr. Piper's cell phone number.

Officer Coverdale asked Mr. Piper to tell him about what happened that evening with EB. Mr. Piper explained that EB called him on his cell phone around 11:00 P.M. wanting a ride from where he was in New Cumberland, Pennsylvania; New Cumberland is approximately a ten (10) minute drive from Mr. Piper's house. Mr. Piper further explained that he had met up with EB at 6th Street in New Cumberland.

Mr. Piper said that he and EB had talked after he picked EB up, that EB told Mr. Piper that he had used Xanax, and that EB reeked of alcohol. Mr. Piper said EB was in bad shape, that he looked drunk and high and that he was "messed up" because he had taken "xannies." EB also told Mr. Piper that he didn't want to go home because of his condition and that it would not be good for EB if he went home. Mr. Piper drove around with EB to get him in better shape to go home. Around midnight Mr. Piper and EB drove to pick up a friend, Derek Delaney, from the convenience store where Delaney worked. It was after they picked up Delaney that EB became non-responsive. They then drove to the house of a friend, Alex (no last name), in New Cumberland, where they threw water on EB and Alex used smelling salts on him; neither worked to revive EB.

Mr Piper explained to Officer Coverdale that they were at Alex's house for approximately twenty to thirty minutes. He and Delaney then drove to Holy Spirit Hospital with EB and parked in the parking lot away from the entrance to the emergency room. They were concerned about getting treatment for EB because they were afraid EB would get into trouble since he was a juvenile. Mr. Piper further explained to Officer Coverdale that EB had been in

6

trouble recently with the police for underage drinking; this was not true, but it was Mr. Piper's understanding. Mr. Piper also explained that he was concerned for himself because EB was a juvenile and so he, Mr. Piper, might get in trouble.

Mr. Piper explained that eventually he drove his car up to the entrance of the hospital's emergency room and both he and Delaney went into the emergency room to seek help for EB.

Mr. Piper was cooperative throughout the interview. He provided Officer Coverdale with Derek Delaney's phone number and "Alex"'s address. He did not refuse to answer any questions about EB or the events of the evening.

Mr. Piper never asked to stop the interview. At no time during the interview did either Officer Coverdale or Mr. Piper get up. Both men spoke in a conversational tone. Officer Coverdale never took out his handcuffs. He never threatened Mr. Piper. He never promised Mr. Piper anything in exchange for Mr. Piper telling him about what happened when he was with EB.

During the interview, Officer Coverdale could see Mr. Piper's face. Mr. Piper appeared tired and fatigued at the beginning of the interview, but Officer Coverdale did not see any indication that Mr. Piper was under the influence of drugs or alcohol. Mr. Piper gave responsive answers; he never gave a non-responsive answer to a question.

Towards the end of the interview, after he'd asked Mr. Piper about the incident with EB at the hospital, Officer Coverdale asked Mr. Piper if he was a drug user. Mr. Piper asked Officer Coverdale if he had to answer the question. Officer Coverdale told him "no," that "he did not have to answer any question he did not want to" answer. Mr. Piper then told Officer Coverdale that he was a marijuana user, a marijuana smoker. Officer Coverdale then asked Mr. Piper if he

used any other drugs, like ecstasy or heroin. Mr. Piper said "no" and that he tried to stay away from people who used those types of drugs.

At the conclusion of the interview, Officer Coverdale asked Mr. Piper if everything they talked about was the truth and was there anything else he should know. Officer Coverdale also gave Mr. Piper his card and told him to contact him if Mr. Piper thought of anything else Officer Coverdale would want to know about. Officer Coverdale testified that he did not give Mr. Piper a Miranda rights warning because Mr. Piper was not under arrest; there was no indication at any time during the interview that Mr. Piper had committed any sort of crime.

At all times when Officer Coverdale spoke to Mr. Piper, he considered him to be a witness and not a suspect. This opinion did not change from the beginning of the interview until the end of the interview because Mr. Piper never said anything to Officer Coverdale that suggested that Mr. Piper had done anything illegal.

Officer Coverdale had no concerns whatsoever that Mr. Piper was a heroin user or abuser. He did not observe anything during the interview that indicated that Mr. Piper used or abused any type of drugs.

At the time of the interview, Officer Coverdale knew Mr. Piper was nineteen years old and that he was fluent in English.

**II. Legal Analysis.**

**A. The lack of the rendering of Miranda warnings by Officer Coverdale to Mr. Piper.**

The defense first contends that Officer Coverdale's questioning of Mr. Piper was a custodial interrogation and therefore his failure to advise him of his Miranda rights before questioning ensued mandates that the statements, and any evidence derived therefrom, must be suppressed. Defendant's Motion to Suppress, p. 5. Under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444. The United States Court of Appeals for the Third Circuit has addressed what is required for a person to be "in custody" for the purposes of Miranda. In United States v. Willaman, 437 F.3d 354 (3d Cir.), cert. denied, 547 U.S. 1208, 126 S.Ct. 2902 (2006), the court of appeals instructed that "[a] person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest'." Id. at 359 (citation omitted). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" Id. (citations omitted). The Willaman court further explained:

> Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile

9

> tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

Id. at 359-60 (citations omitted).

Upon review of the facts of record in this case, we find that Mr. Piper was not in custody at any time during the approximately forty-five (45) minute interview by Officer Coverdale because he neither was arrested formally nor was his freedom of movement restricted to the degree associated with a formal arrest. Therefore, Officer Coverdale was under no obligation to render Miranda warnings to Mr. Piper prior to questioning him on August 19, 2007. Officer Coverdale asked Mr. Piper if he would speak to him about the events with EB during the night. Mr. Piper consented. Officer Coverdale explained to Mr. Piper that he did not have to talk to him and that he'd leave at anytime if Mr. Piper asked him to leave. Mr. Piper never asked Officer Coverdale to leave or discontinue the interview. The interview took place in Mr. Piper's livingroom, with Mr. Piper and Officer Coverdale seated on separate seats, a few feet away from each other. Officer Coverdale spoke to Mr. Piper in a conversational tone. He never took out his handcuffs. He never threatened Mr. Piper. He never promised Mr. Piper anything in exchange for Mr. Piper telling him about the events of the night before with EB. Towards the end of the interview, when Officer Coverdale asked Mr. Piper if he was a drug user and Mr. Piper asked Officer Coverdale if he had to answer the question, Officer Coverdale reiterated to Mr. Piper that he did not have to answer any question that he did not want to answer.

Defendant's motion to suppress is denied to the extent it is premised upon the argument that "[t]he statements Piper rendered to Officer Coverdale on August 19, 2007, as well as any evidence derived therefrom must be suppressed for the reason that the police did not properly

10

advise Piper of his Miranda rights before questioning him in what was a custodial interrogation." Defendant's Motion to Suppress, p. 3.

### B. The voluntariness or involuntariness of Piper's statements to Officer Coverdale.

The defense also contends that the statements made by Mr. Piper to Officer Coverdale, as well as any evidence derived therefrom, must be suppressed because these statements were involuntary "as Officer Coverdale's conduct in interrogating Piper overbore his free will." Defendant's Motion to Suppress, p. 5. "Specifically, Officer Coverdale refrained from advising the 19 year old Piper that EB had died, explaining to Piper only that he was seeking as much information as he could gather as EB was a juvenile and had apparently overdosed on drugs." Id. See also Id. at p. 9 ("When questioned by the police, Piper was simply in no position to intelligently appreciate the consequences of his actions given the coercion that surrounded his speaking with the police.")

As succinctly explained by the appellate court in U.S. v. Jacobs, 431 F.3d 99 (3d Cir. 2005):

> Statements made to a law enforcement officer are inadmissable into evidence if the statements are "involuntary." A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker. If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary. A suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry. A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the confession. The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary.

Id. at 108-109 (footnote and citations omitted).

11

Reviewing the facts of record in this case, the totality of the circumstances indicates that Mr. Piper's statements made to Officer Coverdale on August 19, 2007 were voluntarily made, i.e. Mr. Piper's will was not overborne nor his capacity for self-determination critically impaired. Throughout the forty-five (45) minute conversation, Officer Coverdale was seated several feet away from Mr. Piper and spoke to Mr. Piper in a conversational tone. He told Mr. Piper that he did not have to talk to him and that he'd leave at anytime if Mr. Piper asked him to leave. When Mr. Piper asked Officer Coverdale whether he had to answer the police officer's question about drug use, Officer Coverdale told him no and reiterated that Mr. Piper didn't have to answer any questions posed. No promises were made by Officer Coverdale to Mr. Piper in exchange for his statements. See Jacobs, 431 U.S. at 109 ("A promise by a law enforcement officer may qualify as coercion.") (citations omitted). Officer Coverdale never took out his handcuffs or otherwise threatened Mr. Piper during the interview.

Moreover, with respect to Mr. Piper, whom Officer Coverdale knew to be nineteen years old and fluent in English, and his conduct during the interview, Mr. Piper agreed to speak with Officer Coverdale and was cooperative throughout the interview. He never refused to answer any questions about EB and the events of the evening. He never asked to stop the interview. While he appeared to have just woken up and was groggy and disoriented for the first few minutes of the conversation, he otherwise appeared fine to Officer Coverdale. He gave responsive answers to the police officer's questions; he never gave a non-responsive answer to a question. Officer Coverdale testified that he could see Mr. Piper throughout the interview, and the police officer did not observe any signs of recent use of drugs or alcohol by Mr. Piper.

Finally, in finding that Mr. Piper's statements to Officer Coverdale were made voluntarily, we expressly hold that Officer Coverdale's failure to tell Mr. Piper that EB had died did not render Mr. Piper's statements to Officer Coverdale involuntary.

In short, the totality of the circumstances do not indicate that Mr. Piper's will was overborne or that his capacity for self-determination was critically impaired by Officer Coverdale's conduct as argued by the defense. Defendant's motion to suppress is denied to the extent it is premised upon the argument that the statements Mr. Piper gave to Officer Coverdale on August 19, 2007, as well as any evidence derived therefrom must be suppressed "because any statements Piper made to Officer Coverdale were involuntary as Officer Coverdale's conduct in interrogating Piper overbore his free will." Defendant's Motion to Suppress, p. 5.

### III. Conclusion.

Defendant's Motion to Suppress is denied. An appropriate Order follows.

August 17, 2010

Maurice B. Cohill, Jr.
Senior District Court Judge

13